**Opinion filed April 17, 2025**



## In The

# Eleventh Court of Appeals

_____

## No. 11-23-00022-CR

_____

## JOHNNIE DEE ALLEN MILLER, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 350th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 13518-D**

## O P I N I O N

Appellant, Johnnie Dee Allen Miller, and his son were indicted for the murder of Aaron Kristopher Howard. *See* TEX. PENAL CODE ANN. § 19.02(b)(2) (West Supp. 2024). Howard's death occurred as a result of an altercation over a mattress that had been left in the alley dumpster shared by Appellant and Howard. Appellant and his son elected to have a joint trial. The jury found Appellant guilty of murder and assessed his punishment at confinement for fourteen years in the Institutional Division of the Texas Department of Criminal Justice. The jury acquitted his son.

In five issues on appeal, Appellant contends that (1) there was insufficient evidence to support the jury's rejection of his self-defense claim, (2) the trial court abused its discretion when it did not include three of Appellant's requested jury instructions in its charge, and (3) the trial court abused its discretion when it did not allow testimony about Howard's prior specific acts of violence to be admitted as first-aggressor evidence. We affirm.

*Background Facts*

On the morning of September 1, 2018, Officer Anthony Joeris with the Abilene Police Department responded to a disturbance call at an address on a residential street. The 9-1-1 caller told dispatch that there was an argument between neighbors "about a mattress" and that two of the people involved had firearms. Officer Joeris learned that shots had been fired while he was en route.

Officer Joeris parked his vehicle in the alley where the incident occurred. As Officer Joeris approached, he saw (1) Appellant's son standing and pointing a shotgun at Justin Campbell, who was lying face down on the ground; (2) Appellant standing and holding a pistol; (3) Howard on the ground with a severe head injury and blood on the front of his shirt, and (4) a woman "over the top of" Howard. Howard was "groaning and moaning and didn't seem coherent." After other officers and medical services arrived, Officer Joeris detained Appellant and his son because he determined that "shots had been fired and those were the only two individuals with guns."

Howard was transported from the scene via ambulance and subsequently died from his injuries. Appellant and his son were transported to the police station to be interviewed. Kara Muntean, the woman that was tending to Howard when Officer Joeris arrived, had recorded the shooting on her cell phone and allowed officers to obtain the recording from it. The recording was admitted into evidence and played for the jury.

*The Recording of the Incident*

We note at the outset that Muntean's recording of the shooting has some limitations. For example, Muntean and Howard moved throughout the recording, and Muntean primarily focused her cell phone camera on Appellant and his son. As a result, Howard is "out of frame" for a large portion of the recording, including the moment when he was shot. Nevertheless, Muntean was still able to capture some of the preceding altercation and the shooting itself.

The recording starts with Appellant standing with his pistol lowered at his side and Appellant's son standing diagonally behind him with his shotgun over his shoulder. Howard says, "Oh yeah, you're going to jail," and Appellant responds, "No I'm not." Howard says, "Yes you are. Pull it, m----------r, I'm right f----n' here, you already pointed it." Howard is standing close to Appellant and moves his hand toward Appellant. Appellant tells Howard to "back off." Howard tells someone to "go get my BB gun, I'm gonna put nine in this m----------r. I'm standing at the dumpster, b---h." Appellant tells Howard to "back off" again and says, "If you come closer to me, I'm going to kill you." Howard turns to Muntean and asks, "Hey, did you hear him say he's going to kill me? I'm at the dumpster," before turning to Appellant and telling him to "put the gun up and go inside." Appellant says, "Go inside [unintelligible]." Howard yells, "You pulled a gun in front of my kids [unintelligible] a f-----g mattress. F--- you."

Appellant takes a step toward Howard and says something unintelligible. Howard takes a step toward Appellant and tells him to "point it at me, m----------r. Point it at me." Appellant says, "Okay [unintelligible]. Take your swing." Howard says, "I'm standing my ground, m----------r." Appellant's son says, "So are we," and Howard responds, "No you ain't" while Appellant repeats, "Take your swing." Howard says, "You're in a f-----g alley, you came out to an alley to point a gun. I will kick—you're dead. I promise you, you're dead. [Unintelligible]." Appellant

responds, "I doubt it." Howard says, "You're in an alley with a f-----g shotgun, you little piece of s--t, I'm going to kill you." Appellant repeats, "I doubt it." Howard responds, "Bet."

Appellant's son tells Howard, "First of all, if you're going to show this video to the cops, you might want to stop yelling that you're going to kill us." Howard responds, "Oh no. I don't give a f--k. I will f-----g kill you. You pulled a gun in front of my kids." Appellant slightly raises his pistol and tells Howard to "back off" before lowering it back to his side. Howard tells Appellant, "You pull that gun one more time [unintelligible] I tell you I'll put a bullet through your head." Appellant says, "No you won't," and Howard responds, "Bet." Howard begins repeating, "Point it at me," while Appellant repeats, "Take your swing" and "Back off." Howard tells Appellant that he is "a dead man," and Appellant responds that he "doubts it."

Howard says, "No, I don't give a f--k what the cops say," and Appellant responds, "I don't care what the cops gonna say either, [unintelligible]." Appellant's son moves to the other side of Appellant, and Howard points at Appellant's son and says, "You're a b---h and I'm a [sic] kill you, too." Appellant says, "No you won't." Howard and Appellant's son say "f--k you" to each other and call each other profane names, and Appellant's son makes a lewd gesture at Howard. Howard tells Appellant's son, "You're dead," and Appellant repeats, "I doubt it." Muntean is standing in front of Appellant.

Someone off-camera can be heard saying, "I got you a baseball bat." Muntean moves and briefly films the dumpster. Muntean refocuses the camera on Appellant, and she is now standing slightly further away from him. Appellant tells Howard, "If you come within three foot [sic] of me, I'm gonna kill you." Someone off-camera says, "Okay." Muntean tells Appellant, "You're not gonna shoot my husband." Howard says, "Shoot me. You're dead." Appellant's son moves his shotgun off his

shoulder. Someone off-camera says, "You're dead. Point it. Point it." Muntean has her camera pointed toward Appellant's son and neither Appellant nor Howard are in frame. Two shots can be heard, and Muntean moves before pointing the camera back at Appellant and his son. Appellant holds his arm up defensively as a baseball bat hits him before aiming his pistol again. Appellant's son raises his shotgun. At least two more shots are fired. Howard falls to the ground, and someone can be heard saying, "Get down. Face down."

*Appellant's Interview*

Detective Frank Shoemaker with the Abilene Police Department interviewed Appellant. He watched the recording before speaking to Appellant. Detective Shoemaker testified that Appellant waived his *Miranda*[1] rights, agreed to speak with him, and "just started talking." Appellant's interview was admitted into evidence and played for the jury.

Appellant told Detective Shoemaker that he saw an old mattress laying against his gate the day before the shooting, and that he threw the mattress by the dumpster he shared with Howard and his family. On the morning of the shooting, the mattress was leaning against Appellant's gate again. Appellant took the mattress back to the dumpster, and Howard came outside "[w]hooping and hollering." Appellant said Howard was "rushing" at him and told him, "I'm going to do this to you if you throw that mattress on my side of the thing."

Appellant went back inside his property gate as his son was coming outside. Appellant told his son to bring him his billfold because he wanted his concealed carry license. Appellant also told his son to "bring your shotgun with you. Just in case." Appellant and his son walked back into the alley. Howard was "wildly raving

---

[1]*See Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966); *see also* TEX. CODE CRIM PROC. ANN. art. 38.22, § 2(a) (West Supp. 2024).

and ranting." Howard said that he was a martial artist and that he had a firearm in his house. Howard told Appellant, "If you ever throw [the mattress] on my place again, I'm going to kill you." Appellant saw Muntean recording him with her cell phone.

Howard "rushed" at Appellant again, and Appellant took his pistol, a .40 caliber "Smith & Wesson Shield," out of its holster. Appellant told Howard to stay at least three feet away from him. Appellant told Detective Shoemaker, "I pulled the gun on [Howard] and he just went ballistic." Howard went inside his property gate and began throwing pieces of cinderblock at Appellant. One piece scraped Appellant's leg.[2] Howard then exited his property gate and went back into the alley. Appellant "charged" his pistol, meaning he "put a round in the chamber."

Campbell brought Howard a baseball bat. Howard began "[w]aving the bat around, raving and ranting." Appellant pointed his pistol at Howard and told him to stay at least three feet away from him. Howard threatened to kill Appellant. Howard then threw the bat at Appellant, which hit him in the elbow, and "acted like he was going to make a rush" for Appellant. Appellant shot Howard.

Appellant thought he shot three times. Appellant stated that Howard "started back for me saying he was going to kill me" after the first shot, so he "just kept on shooting." Appellant said that he stopped shooting once Howard "went down." Appellant said that his son never fired his shotgun. Appellant believed he was standing three-to-four feet away from Howard when he shot.

Appellant told Detective Shoemaker that "you don't go outside your house expecting something like this to take place." Appellant said that he thought Howard was only going to "rush" him at first. Appellant said he thought Howard was "serious" when he began throwing cinderblocks and "knew he was serious" when

---

[2]Detective Shoemaker testified that he saw a scrape on Appellant's calf.

Howard threw the bat. When Detective Shoemaker asked Appellant why he did not leave, Appellant responded, "I didn't want to leave." Appellant said that Howard had "done this before" and that he "was perfectly willing to sit there and wait for the police." Appellant said that he "was not going to hide inside the yard or hide inside [his] house and just let [Howard] just run over [him]," and that he was not going to be hit with a bat and get "beat on."

Appellant told Detective Shoemaker that "[he] did and [he] didn't" have problems with Howard before the shooting, and that he had witnessed other incidents involving Howard in the neighborhood. Appellant said that Howard had a previous confrontation with a code enforcement officer where Howard was "[w]hooping and hollering and [gesticulating] again" because it was "something [Howard did] all the time." Howard threatened to kill the code enforcement officer and told the officer that he had a firearm. Appellant approached and told Howard that the code enforcement officer was just "doing his job." Howard cursed at Appellant, accused him of being the person that called code enforcement, and threatened to kill Appellant.

Appellant also saw police respond to a fight between Howard and Campbell. Appellant told Detective Shoemaker that Howard told the officers to stay off his property and told the officers that he had a firearm. Appellant said that Howard accused a woman across the street of calling the police on him and threatened her. Appellant did not get involved, but spoke with an officer who said that they had had twenty-three previous interactions with Howard. Appellant said that he started carrying his pistol on his person after Howard "done this the first time."

*The Interview of Appellant's Son*

Sergeant Jordan Brown with the Abilene Police Department interviewed Appellant's son. Sergeant Brown watched the recording before speaking to him.

7

Appellant's son waived his *Miranda* rights and agreed to speak with Sergeant Brown. The interview was admitted into evidence and played for the jury.

Appellant's son told Sergeant Brown that Appellant went outside and saw a mattress propped against his gate. The mattress had previously been in the dumpster. Appellant came inside and told his son to get his firearm for him and to come outside. His son grabbed his shotgun and Appellant's pistol and followed Appellant outside. Appellant's son said that he and Appellant "figured we were just going to move the mattress back over, that was going to be the end of it." As Appellant was moving the mattress back, Howard "came . . . within two or three feet of [Appellant] and said if you put that in front of my f-----g fence again, I will kill you dead." Appellant told Howard to "back off" several times, and Howard continued to threaten to kill Appellant if he put the mattress in front of Howard's fence. Campbell and Muntean walked up, and Muntean started recording the incident.

Appellant continued to tell Howard to back off, but Howard "kept getting in his face." Appellant took his pistol out of its holster, and Howard said, "you are going to pull a f-----g gun on me in front of my kids. I will kill you dead on the spot." Howard also threatened to kill Appellant's son. At some point, either Campbell or Howard began throwing bricks at Appellant and his son. The bricks did not hit them and "landed maybe a foot or two away." Campbell called the police. Appellant's son told Campbell that he and Appellant didn't care if Campbell called the police and that they would wait to speak with them.

Appellant's son said Howard began "going crazy again" and told Campbell to "grab my gun, I'm going to shoot this f----r with my nine." Campbell left and returned with a baseball bat, and Howard began threatening Appellant with the bat. Howard "rais[ed] [the bat] up" and came within two-to-three feet of Appellant. Appellant told Howard to back off and said, "If you come within three feet of me again something is going to happen that you are not going to like." Howard came

8

within "several inches" of Appellant and threw the bat. Appellant shot Howard. Howard then "came at [Appellant] again with his arms raised like he was going to hit him in the face." Appellant shot Howard again, and Appellant's son shot Howard with his shotgun.

Appellant's son said his father was a sixty-seven-year-old man and he did not want him to get hurt. Appellant never said anything antagonizing to Howard, but Appellant's son said he made a "lewd gesture" toward Howard at one point.

Appellant's son told Sergeant Brown that Howard "goes crazy over anything and everything, whether it is his fault or not," "[t]o the point of making threats against everybody." Appellant's son said that he and Appellant take firearms with them when going out to their front lawn "just in case [Howard] goes crazy." Appellant's son had witnessed other incidents involving Howard. He said that the incident with the code enforcement officer happened less than a month after Howard moved in. Howard threatened to shoot the code enforcement officer and threatened to shoot Appellant when he went over to diffuse the situation. One and one-half months later, Howard and Campbell were "slugging it out" in their front yard. The police were called, and when they arrived, Howard yelled at them to "get the f--k off my lawn" and threatened to shoot the police with a firearm he had behind the door. Howard also pointed to a woman across the street and threatened to shoot her for calling the police, then pointed at the Millers and said, "I will kill you too." Appellant's son recalled one of the responding officers telling him that she had been "involved on something like 27 cases for this guy in Abilene alone."

*Kara Muntean's Testimony*

Muntean testified that she began dating Howard in 2017. She described the relationship as not "perfect," but "pretty good." Howard had been diagnosed with intermittent explosive disorder. Howard was taking Seroquel and Wellbutrin and was a patient at a local mental health facility. Muntean recalled "a couple" of

9

incidents where Howard became upset with employees at the mental health facility and yelled at them. Muntean said that Howard's temper could "flare up out of nowhere," and that he would sometimes yell and throw things like his phone or a lighter.

Muntean did not witness any of the other incidents that occurred in the neighborhood, and she never heard Howard threaten anyone before the day of the shooting. Muntean testified that Howard had never assaulted her. Muntean said that there was one incident where Howard grabbed her arm and pulled her out of the street to prevent her from being hit by a car. Muntean confirmed that the police were called after Howard grabbed her arm and that she refused to speak to them. Muntean denied being injured in the incident. Muntean said that Howard did not hit Campbell's children, with the exception of spanking them.

Muntean testified that she, Howard, Campbell, and Campbell's children got into their vehicle on the morning of the shooting. Howard drove the vehicle into the alley behind their home so that they could take the scrap metal off the trailer and place it in the backyard. Muntean saw a mattress that Campbell had thrown away leaning against their fence. Howard got out of the vehicle and put the mattress into the dumpster. Muntean began unloading the scrap metal from the trailer. Muntean then saw Appellant pull the mattress out of the dumpster, and heard Howard tell Appellant to put the mattress back.

Appellant and Howard began arguing, and Muntean saw Howard "getting a little heated." Muntean saw Appellant pull a pistol out of his shorts and point it at Howard. Muntean estimated that there was ten feet between Howard and Appellant. Muntean testified that Howard had not threatened Appellant prior to Appellant pulling his pistol out of his shorts.

Muntean testified that Howard "got extremely irate" when Appellant pointed his pistol at him, because Howard was standing in front of their vehicle with

10

Campbell's children inside. Muntean told Appellant that there were children in the vehicle, and Appellant lowered his pistol. Muntean watched Appellant's son peek out from the Miller's gate to "[see] what was going on," step back behind the gate "for a few seconds," and then walk out into the alley with his shotgun over his shoulder. Howard told Campbell to take the children inside, and Muntean began recording the incident with her cell phone.

Muntean testified that Howard was "yelling a lot." Howard began pacing and "got in [Appellant's] face for a second," telling Appellant "point it at me," referring to Appellant's pistol. Muntean stepped in front of Howard to get in between him and Appellant because she "was afraid that things were escalating." Howard told Campbell to go get a firearm. Campbell returned with a baseball bat, and Howard grabbed the bat by its barrel.

Muntean estimated that she was standing "four or five feet" away from Appellant when he first shot Howard. Muntean testified that she did not know what prompted Appellant to shoot Howard, that Howard did not "rush past" her in an attempt to hit Appellant, and that Howard was never less than "[s]even, eight feet" away from Appellant. After the first shot was fired, Muntean thought she saw the bat "fly" over their heads, but after watching the recording realized it bounced and hit Appellant.

The next thing Muntean saw was Appellant's son aiming his shotgun at Howard. Muntean heard two more shots before seeing Howard fall to the ground. Muntean testified that she stopped recording and ran to Howard to put pressure on his chest wound and head wound. Appellant's son made Campbell lie face down on the ground and pointed the shotgun at his head. Appellant walked to Muntean, placed his pistol to her head, and told her, "if you move, we're going to kill you, too."

11

*Justin Campbell's Testimony*

Campbell testified that Howard, a family friend, began living with him in 2014. He described Howard as "aggressive" but "also very loving and very caring." Campbell said that Howard "knew he was a big guy" and was intimidating. Howard would yell and curse when he was angry. Campbell testified that Howard took medication for his "anger and explosions," but "[n]othing" could calm him down.

Campbell confirmed that he had once gotten into a fight with Howard that resulted in the police being called. Campbell said that he and Howard were arguing and that he punched Howard in the mouth, starting a physical fight. Campbell denied that Howard slammed his head into the driveway during the fight. Campbell testified that Howard "[m]ore than likely" told police to "get the eff off my property" when they arrived, but he did not hear Howard threaten the police.

Campbell's testimony about the shooting largely mirrored Muntean's testimony. Campbell had thrown a mattress into the shared dumpster a couple days prior. At some point, Campbell noticed the mattress had been removed and placed at the side of the dumpster, so he picked it up and put it back in the dumpster.

When Howard pulled the vehicle into the alley on the morning of the shooting, Campbell saw the mattress had been placed on the side of the dumpster again. This time, Howard placed the mattress back in the dumpster. Campbell then heard Howard say, "[P]ut it back." Campbell looked to see what was happening and saw Appellant pull a pistol from his shorts, point it at Howard, and then lower it to his side. Campbell called 9-1-1.

Howard was yelling at Appellant. At one point, Howard told Appellant, "[I]f you point that gun at me again, I'm going to kill you." Howard was pacing back and forth and approached Appellant at one point. Campbell got his children out of the vehicle to take them into the house, and Howard told Campbell to get him his firearm. Campbell told Howard that he did not have a firearm, and Howard told him

12

to grab his "BB gun." Campbell took the children inside and grabbed a baseball bat before returning. Howard grabbed the bat by the barrel and took it from Campbell.

Appellant's son was now outside and carrying his shotgun over his shoulder. Campbell testified that Appellant, Appellant's son, and Howard were "just screaming and yelling at each other," and that Howard "might have been" waving the bat around. Muntean was standing between Appellant and Howard and recording the incident. Campbell estimated that Howard was standing "six, seven [feet]" away from Appellant while holding the bat and that he never got within striking range of Appellant. Campbell did not see Howard take any steps toward Appellant. Campbell heard a shot, saw Howard throw the baseball bat, and heard another shot before Howard hit the ground. After Howard fell, Appellant told Campbell to get on the ground. Campbell complied, called 9-1-1 again, and remained on the ground until the police arrived.

On cross-examination, Campbell confirmed that he told a detective that Appellant was "within arm's reach" of Howard "a few different times." Campbell also confirmed that he told an officer that Howard "went to swing [the bat]" at Appellant when he fired. Campbell clarified on redirect examination that Howard was "waving [the bat] around," but was never less than ten feet away from Appellant while he was holding the bat. Campbell admitted that he told officers Howard "was going to kill the neighbors," and that the Millers "were lucky" that Howard did not have a firearm.

*Medical Examiner Testimony*

Dr. Tasha Greenberg, the deputy chief medical examiner for the Tarrant County Medical Examiner's Office in Fort Worth performed Howard's autopsy. Dr. Greenberg testified that Howard had a gunshot wound in his right forearm. The bullet entered through the medial part, or "pinky side" of Howard's forearm, and exited out the radial side, or "thumb side." Dr. Greenberg testified that the angle of

13

the gunshot wound in Howard's arm could be consistent with him holding a bat in the air at the time he was shot. Dr. Greenberg was able to determine that the shot had been fired from at least a couple of feet away from Howard because of the lack of soot or gunpowder stippling on his forearm.

Dr. Greenberg testified that Howard also suffered a gunshot wound to his chest, which entered through his left side. The chest wound did not have soot or gunpowder around it. Finally, Dr. Greenberg testified that Howard's "shotgun wound to the head" caused injuries to his skull and brain. Dr. Greenberg concluded that both the wound to the chest and the shotgun wound to the brain would have been sufficient to cause Howard's death. Dr. Greenberg opined that both the act of shooting someone in the chest and the act of shooting someone in the head with a shotgun were acts clearly dangerous to human life.

*Testimony from the State's Witnesses Regarding Howard's Reputation*

Officer Joeris testified that Howard "had a reputation" in the police department for being "[l]oud and intimidating." Officer Joeris's body camera recorded another officer on scene telling him that he "[couldn't] think of a better person," referring to Howard. Sergeant Brown testified that he was not familiar with Howard at the time of the shooting, but he subsequently learned that Howard had a reputation for being aggressive and that there had been "[l]ots of incidents" involving him.

Josh Mares was a City of Abilene code enforcement officer. Mares testified about a complaint of unsightly conditions at Howard's house that he responded to in May 2018. Mares was taking photographs of the violations when Howard came outside. Mares testified that Howard was calm and cooperative at first. Howard told Mares that the previous residents had left items behind and were responsible for the unsightly conditions. But, when Mares began discussing a junk vehicle violation,

14

Howard's demeanor became threatening. Mares testified that Howard began pacing and would walk within one to two feet of him.

Mares testified that a neighbor attempted to diffuse the situation, but left after Mares told the neighbor it would be better if he went back inside his house. After going "back and forth" with Mares, Howard told Mares to "get the f--k off my property; if you come back, you will be shot without warning." Mares told Howard that he would return with a marshal, and Howard repeated that he would "shoot [Mares] without warning." Mares reported the incident to the city marshal, and Howard was charged with threatening a public servant.

Officer John Chong with the Abilene Police Department testified that he was dispatched to Howard's house in June 2018 regarding a disturbance. When Officer Chong arrived, he saw two people yelling. Officer Chong testified that neither of the two individuals were cooperative and that they were "loud and rude and cussing," but neither party threatened officers. Officer Chong was unable to recall the names of the two individuals because no arrest was made and a police report regarding the incident was never filed. But Officer Chong recognized the name Aaron Howard. Officer Chong testified that he had heard of Howard prior to the incident and that Howard "doesn't like the police. And he's a large individual." Officer Chong said that Howard was intimidating because of his large size and failure to cooperate.

*Appellant's Motion for Directed Verdict*

At the close of the State's case-in-chief, both Appellant and his son moved for a directed verdict. They asserted that there was a "question" about the "mental state as alleged in the indictment" and that the State failed to prove that the offense occurred in Taylor County. The trial court denied the motion, holding that there was "sufficient evidence from which to glean, both by statement and by act, the mental state," and noting that Officer Joeris testified that the shooting happened in Taylor County.

*Defense Witness Testimony*

Angel Montelongo, a mail carrier, testified that, four days before the shooting, Howard came outside of his house and accused Montelongo of looking into his daughter's window as he was delivering mail. Montelongo told Howard that he did not look into the window and said that "it would be easier" if he put Howard's mail on hold. Howard continued yelling at Montelongo before going inside. Howard then came back outside and began recording Montelongo with his cell phone while yelling at him. Montelongo quickly walked back to his mail truck, but Howard followed, threatening to kill Montelongo and saying things like "the Government's trying to get me." Howard continued yelling and began banging on the door of Montelongo's mail truck while Montelongo called his supervisor. The incident caused a hold to be placed on the entire street's mail.

Courtney Estes testified that she lived on the same street as Howard in the summer of 2018. Estes said that she saw Howard pull Muntean down to the ground by her hair during an argument. There were children in the yard, and Howard raised the back of his hand at them in a manner consistent with "backhand[ing] someone". The children ran into the house. Estes also saw a fight between Howard and Campbell and saw one of the men swing a skateboard at the other. Estes heard Howard tell responding police officers that "if they stepped foot on his property, he would kill them."

Louise Dunlap also lived on the same street as Howard. Dunlap testified that she witnessed Howard and Campbell fighting in January of 2018 and saw Howard "picking up [Campbell] and body-slamming him on the concrete." Police officers responded, and Howard pointed his finger at an officer's chest and threatened to kill her if she did not get off his property. Dunlap testified that Howard "more or less made [the officer] walk all the way out to the street with him poking his finger at her."

16

Bill Whitley a Marshal with the City of Abilene investigated the incident between Howard and Joshua Mares, the code enforcement officer. Marshal Whitley testified that he knew Howard from previous incidents and that he would consider Howard to be a person of "bad character."

Officer Jimmy Woods with the Abilene Police Department was one of the officers who responded to the shooting. Officer Woods testified that Howard was well-known in the police department as an aggressive man that had been "called out on many times." Four other defense witnesses testified that Howard had a "bad character" or reputation of violence.

*Objection to "Inconsistent Verdicts"*

After the jury found Appellant guilty and found Appellant's son not guilty, Appellant objected to "any further proceedings and even allowing a jury to consider punishment because of their inconsistent verdicts that they returned" and "move[d] for a judgment of acquittal." Appellant's trial counsel argued that the jury returning a verdict of not guilty for Appellant's son was inconsistent with a verdict of guilty for Appellant because "the only possible basis for a finding of not guilty in [Appellant's son's] case was the defense of [a] third party," and that the jury's not guilty verdict "foreclosed the particular issue of self-defense with regard to [Appellant]." Trial counsel asserted that the jury was "not authorized" to find Appellant guilty after finding Appellant's son not guilty. The trial court denied trial counsel's request.

*Analysis*

*Jury's Rejection of Appellant's Self-Defense Justification*

In Appellant's first issue, he contends that there was insufficient evidence to support the jury's rejection of his self-defense claim. Self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's self-defense theory. *See Braughton v. State*, 569 S.W.3d 592,

17

609 (Tex. Crim. App. 2018); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). A defendant has the burden of producing some evidence to support a defense claim. *Braughton*, 569 S.W.3d at 608; *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *see also Saxton*, 804 S.W.2d at 913–14 (contrasting affirmative defenses and explaining how burdens shift for self-defense). If the defendant produces some evidence supporting his self-defense claim, the State has "the burden of persuasion to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594. The State's burden does not require the production of any additional evidence; instead, "it requires only that the State prove its case beyond a reasonable doubt." *Id.*; *see Saxton*, 804 S.W.2d at 913. Because the State must disprove a defense claim by establishing its case beyond a reasonable doubt, we review legal and factual sufficiency challenges to the jury's rejection of a defense claim under the legal sufficiency standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Saxton*, 804 S.W.2d at 914.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Thus, when reviewing the sufficiency of the evidence to support a conviction involving a claim of self-defense, we review the sufficiency of the evidence to support a jury's rejection of a defendant's self-defense theory by examining all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the

offense and also could have found against the defendant on the defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914 (citing *Jackson*, 443 U.S. 307).

When conducting a sufficiency review, we defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly proves the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.2d 446. 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

A person commits the offense of murder if the person "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." PENAL § 19.02(b)(2). The indictment alleged that Appellant:

. . . intentionally and knowingly, with intent to cause serious bodily injury to an individual, namely, AARON KRISTOPHER HOWARD, commit[ted] an act clearly dangerous to human life, to-wit: by shooting the said AARON KRISTOPHER HOWARD in the chest, head and arm with a firearm, thereby causing the death of the said AARON KRISTOPHER HOWARD[.]

Appellant concedes that he shot Howard and caused his death but asserts that there was insufficient evidence to support the jury's conclusion that his actions were not justified by self-defense.

In asserting self-defense, the use of force is justified "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2019). In the same manner, the use of deadly force against another is justified under the above circumstances "if the actor would be justified in using force against the other" under Section 9.31 and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). A reasonable belief is a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. *Id.* § 1.07(a)(42). Under certain conditions, an actor's belief that deadly force was immediately necessary is presumed to be reasonable. *Id.* § 9.32(b).

Appellant asserts that the jury should have accepted his self-defense theory because the evidence "indisputabl[y]" showed that Howard was standing no more than eight feet away from Appellant when Howard raised a baseball bat over his head and threatened to kill Appellant. Appellant further asserts that, although "some evidence may show that Howard was not within striking distance of [Appellant] at the exact moment [Appellant] pulled the trigger," that evidence "does not support a

20

rational finding that the use of deadly force was not justified." Appellant contends that the jury did not have to choose between different versions of facts and that its verdict "did not hinge on the credibility of the witnesses." Therefore, Appellant asserts, the jury did not act rationally in rejecting "the only version of the events" presented to them.

The State characterizes Appellant's propositions as "simply not correct" because the "entire case hinged on competing versions of events." The State highlighted the differences between (1) Appellant's son's statement that Appellant asked him to bring him his firearm with Appellant's statement and Muntean and Campbell's testimony that Appellant had his firearm on his person at the start of the altercation; (2) Appellant's statement that he did not point his firearm at Howard until after Howard threw cinderblocks and Muntean and Campbell's testimony that Appellant pointed his firearm at Howard "without cause . . . before any threatening behavior or words had ever been exchanged;" and (3) Appellant's statement that Howard threw the bat and began charging at him before he shot and Muntean and Campbell's testimony that Howard was not within striking distance of Appellant when he was holding the bat, was not moving toward Appellant when Appellant shot him, and was shot before he threw the bat at Appellant.

In his reply brief, Appellant asserts that the State mischaracterized the weight of the differences in the evidence presented at trial. Appellant contends that the differences the State listed focus on the "initial actions" of Appellant and Howard. Appellant concedes that the jury could have determined that (1) Appellant had his firearm on his person at the start of the altercation; (2) Appellant pointed his firearm at Howard at the beginning of the argument; (3) Howard did not throw cinderblocks at Appellant; (4) Howard was not within striking distance of Appellant when he was shot; and (5) that Howard threw the bat after Appellant fired, rather than before. But Appellant maintains that a rational jury could not have found that Appellant did

21

not act in self-defense, instead focusing on the "indisputable" evidence that (1) Appellant did not raise his firearm again until Howard had the bat in his possession; (2) Howard repeatedly threatened to kill Appellant; (3) Howard had the bat raised above his head while threatening to kill Appellant and standing "no more than eight feet from him" before Appellant shot him; (4) Howard "was a large man with a propensity for violence;" and (5) Appellant had "witnessed multiple instances of Howard's violent behavior."

There is ample evidence in the record that supports the jury's rejection of Appellant's claim of self-defense. The recording of the incident is replete with oral threats by Appellant to shoot Howard if Howard came within three feet of him. Yet, when Howard told Appellant to "put the gun up and go inside," Appellant refused to do so. Appellant repeatedly responded, "I doubt it" and "No you won't" when Howard threatened to kill him. When Detective Shoemaker asked Appellant why he did not leave, Appellant responded, "I didn't want to leave." Appellant also told Detective Shoemaker that he was not going to be hit with a bat and "get beat on" by Howard. Appellant told Detective Shoemaker that he was standing three to four feet away from Howard when he shot.

Further, Muntean and Campbell testified that Howard grabbed the bat by the barrel, rather than the handle. Muntean testified that she did not know what prompted Appellant to shoot, because Howard did not rush toward Appellant and was never closer than seven feet away from Appellant.[3] Campbell testified that he never saw Howard take steps toward Appellant while he was holding the bat. There was a lack of stippling on Howard's body, consistent with shots being fired from at least a couple of feet away. Therefore, there is evidence in the record upon which the jury could have reasonably concluded that Appellant did not believe deadly force

---

[3]As noted previously, the recording does not depict Howard at the time he was shot.

was immediately necessary to protect himself from Howard's use of unlawful deadly force.

Moreover, the record contained evidence supporting the jury's rejection of Appellant's claim that his actions were reasonable under the circumstances. Section 9.32(c) states that:

> A person who has a right to be present at the location where the deadly force is used, who has not provoked the person against whom the deadly force is used, and who is not engaged in criminal activity at the time the deadly force is used is not required to retreat before using deadly force as described by this section.

PENAL § 9.32(c). The charge's instruction on the failure to retreat stated as follows:

> **Failure to Retreat**
>
> A person who has a right to be present at a location where the person uses deadly force against another is not required to retreat before using deadly force in self-defense if both—
>
> 1. the person with the right to be present did not provoke the person against whom the deadly force is used; and
>
> 2. the person is not engaged in criminal activity at the time the deadly force is used.
>
> Therefore, in deciding whether the state has proved that the defendant did not reasonably believe his use of deadly force was necessary, you must not consider any failure of the defendant to retreat that might be shown by the evidence if you find both—
>
> 1. the defendant did not provoke Aaron Kristopher Howard, the person against whom the defendant used deadly force; and
>
> 2. the defendant was not engaged in criminal activity at the time he used the deadly force.
>
> If you do not find both 1 and 2, you may consider any failure of the defendant to retreat that might be shown by the evidence in deciding whether the defendant reasonably believed his use of deadly force was necessary.

23

In this specific context, the jury could have reasonably concluded that Appellant telling Howard to "take your swing" in conjunction with the way that Appellant repeatedly responded "I doubt it" to Howard's threats to kill him constituted provocation. And, if the jury did so conclude, it could have factored Appellant's provocation and failure to retreat into its reasonableness analysis. *See Morales v. State*, 357 S.W.3d 1, 5–6 (Tex. Crim. App. 2011).

In summary, a rational jury could have found that Appellant's use of force was neither reasonable nor justified. The jury was free to judge the credibility and weight of all of the evidence presented. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13. Therefore, viewing the evidence in the light most favorable to the jury's verdict, we conclude that the State presented sufficient evidence from which a trier of fact could have found, beyond a reasonable doubt, all of the essential elements of murder and also could have found against Appellant on his claim of self-defense.

Appellant also contends that the jury did not act rationally when it rejected his self-defense claim but accepted Appellant's son's defense, which was premised on the defense of a third person. Appellant assumes that the jury found Appellant's son not guilty because it accepted his defense-of-a-third-person theory, meaning that "the jury accepted that [Appellant's son] had a reasonable belief that Howard was attempting to use deadly force against [Appellant]." Appellant asserts that the circumstances supporting his son's reasonable belief that he needed to use deadly force to protect Appellant were the same circumstances supporting Appellant's reasonable belief that he needed to defend himself. Thus, Appellant argues, his son's "use of deadly force to protect [Appellant] was only justified if [Appellant's] use of deadly force to protect himself was justified."

The State asserts that we "cannot know if the defense of the third person instruction was the reason for [the] acquittal." The State lists in its brief possible

24

conclusions that the jury could have rationally made, including that (1) while Appellant was not reasonably acting in self-defense when he first shot Howard, Appellant's son was reasonably acting in defense of his father when he shot Howard after Appellant fired; or (2) because both the shot to Howard's chest and the shot to Howard's head were independently fatal, and because Appellant shot first, his son's shot was "superfluous."

First, we note that, when codefendants are tried together, "the jury may convict each defendant it finds guilty and acquit others." CRIM. PROC. art. 37.11 (West 2006). However, there is a lack of authority in Texas jurisprudence with respect to a claim of "inconsistent" verdicts that involve codefendants. The Fifth Circuit addressed a similar situation in *Odom v. United States*, 377 F.2d 853 (5th Cir. 1967). The court in *Odom* held that "[t]he rendering of inconsistent verdicts has always been an exclusive privilege and prerogative of the jury, and it is not our duty to unravel the ratiocinations of the jury's collective logic." *Odom*, 377 F.2d at 857 (collecting cases); *see Green v. State*, 233 S.W.3d 72, 84 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). As set out below, a claim of inconsistent verdicts has no effect on our review of the sufficiency of the evidence.

Texas courts have dealt with claims of inconsistent verdicts in other contexts. "[I]nconsistent verdicts in prosecutions based on the same evidence do not require a reversal on the ground of legal insufficiency." *Thomas v. State*, 352 S.W.3d 95, 101 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (citing *Jackson v. State*, 3 S.W.3d 58, 61 (Tex. App.—Dallas 1999, no pet.)). "Inconsistent verdicts do not necessarily imply that the jury convicted the defendant on insufficient evidence, but may simply stem from the jury's desire to be lenient or to execute its own brand of executive clemency." *Id.* (citing *Moranza v. State*, 913 S.W.2d 718, 724 (Tex. App.—Waco 1995, pet. ref'd)). In the criminal realm, "the law does not bar inconsistent verdicts." *Guthrie–Nail v. State*, 506 S.W.3d 1, 6 (Tex. Crim. App. 2015) (citing *United*

25

*States v. Powell*, 469 U.S. 57, 68–69 (1984); *Dunn v. United States*, 284 U.S. 390, 393 (1932)).

Accordingly, the State's assertion that the jury could have acquitted Appellant's son for a reason other than his defense-of-a-third-person claim is correct.[4] Because there is a possibility that the jury could have acquitted Appellant's son for a reason other than his defensive theory of defense of a third person, we cannot conclude that the jury's verdict acquitting Appellant's son was inconsistent with the jury's verdict convicting Appellant. Further, because there was sufficient evidence in the record supporting the jury's rejection of Appellant's self-defense claim, we cannot conclude that the jury acted irrationally when it did so. We overrule Appellant's first issue.

*The Defense of Necessity*

In Appellant's second issue, he contends that the trial court abused its discretion by denying his requested jury instruction on the defense of necessity. *See* PENAL § 9.22. A trial court is required to instruct a jury on any "statutory defenses, affirmative defenses, and justifications whenever they are raised by the evidence," regardless of whether the defensive evidence is "strong, weak, unimpeached, or contradicted." *Walters v. State*, 247 S.W.3d 204, 208–09 (Tex. Crim. App. 2007); *Booth v. State*, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984); *see* PENAL § 2.03. (West 2021).

A defensive issue is raised by the evidence if there is some evidence, regardless of its source, on each element of a defense that, if believed by the jury, would support a rational inference that the element is true. *See Shaw v. State*, 243

---

[4]The jury sent two notes to the trial court during guilt/innocence deliberations—one asking for the "Original video, interrogation of [Appellant's son] and [Appellant]," and one asking, "What did Judge say if [Appellant] is found guilty, what can happen? Need transcript." Therefore, there is nothing in the record that indicates whether the jury was considering the merits of the defense-of-a-third-person claim made by Appellant's son.

S.W.3d 647, 657–58 (Tex. Crim. App. 2007). When deciding whether a defensive issue has been raised by the evidence, a trial court must rely on its own judgment, formed in light of its own common sense and experience, as to the limits of rational inference from the facts that have been proven. *Id.* at 658. Whether the record contains such evidence is a question of law, which means that we do not apply the usual rule of appellate deference to the trial court's ruling. *Id.* "Quite the reverse, we view the evidence in the light most favorable to the defendant's requested submission." *Bufkin v. State*, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

The necessity defense justifies an actor's conduct if:

>(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

>(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

>(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

PENAL § 9.22. Appellant asserts that he was entitled to a necessity instruction because the murder statute contains no legislative purpose to exclude necessity as a defense. However, we and several of our sister courts have concluded that an instruction on deadly-force self-defense precludes a necessity instruction. *See Sneed v. State*, No. 11-15-00320-CR, 2017 WL 2588164, at *3 (Tex. App.—Eastland 2017, pet. ref'd) (mem. op., not designated for publication); *see also, e.g.*, *Rollins v. State*, No. 03-24-00106-CR, 2025 WL 793890, at *6–7 (Tex. App.—Austin Mar. 13, 2025, pet. filed) (collecting cases); *Chase v. State*, 666 S.W.3d 832, 835 n.2 (Tex. App.—Tyler 2023), *cert. denied*, 144 S. Ct. 580 (2024); *Darkins v. State*, 430 S.W.3d 559, 571–72 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Striblin v. State*, No. 04-17-00826-CR, 2019 WL 1049233, at *4 (Tex. App.—San Antonio Mar. 6, 2019, pet. ref'd) (mem. op., not designated for publication);

*Kelley v. State*, 05-15-00545-CR, 2016 WL 1446147, at *7 (Tex. App.—Dallas Apr. 12, 2016, pet. ref'd) (mem. op., not designated for publication); *Wilson v. State*, No. 06-14-00021-CR, 2014 WL 8332264, at *6 (Tex. App.—Texarkana Nov. 7, 2014, pet. ref'd) (mem. op., not designated for publication).[5]

In *Sneed*, we determined that,

> When deadly force in self-defense is the conduct that is allegedly "immediately necessary" under the first element of the necessity defense found in Section 9.22(1), the defense of necessity does not apply. The self-defense statute, Section 9.32 of the Penal Code, contains a plain legislative purpose precluding a necessity instruction when self-defense is implicated.

*Sneed*, 2017 WL 2588164, at *3 (internal citations omitted). The Tyler Court of Appeals similarly concluded in *Chase* that:

> A plain reading of Section 9.32 shows that the Legislature intended to impose a higher standard for justification of deadly force, permitting its use *only* when the actor's life is immediately threatened by another's use of unlawful deadly force or to prevent the commission of specific violent crimes. A necessity defense involves a substantially lower showing, requiring only that the conduct be necessary to "avoid imminent harm." Therefore, allowing an instruction on necessity when the appellant used deadly force *and* obtained a jury instruction on self-defense would undermine the legislative purpose of limiting the justifiable use of deadly force to preventing an immediate threat to one's life or preventing the commission of specific violent crimes.

*Chase*, 666 S.W.3d at 835 (internal citations omitted).

---

[5]We note that both the Corpus Christi and the El Paso courts of appeals have concluded that a deadly-force self-defense instruction does *not* foreclose the availability of a necessity instruction. *See Castro v. State*, No. 13-17-00266-CR, 2019 WL 3484426, at *2–3 (Tex. App.—Corpus Christi–Edinburg 2019, no pet.) (mem. op., not designated for publication); *Walker v. State*, No. 08-17-00133-CR, 2019 WL 3713757, at *11 (Tex. App.—El Paso 2019, no pet.) (not designated for publication); *but see Rollins*, 2025 WL 793890, at *6 (noting that the court in *Castro* "explained that its determination was based on one of its prior rulings and acknowledged that the law in this area had not been resolved," and that the court in *Walker* "rul[ed] on harm rather than deciding to rule on availability of necessity instruction").

"The Court of Criminal Appeals has neither examined legislative intent in relation to Section 9.32, nor ruled whether, when a defendant uses deadly force, the presence of a self-defense instruction bars a necessity instruction."[6] *Id.* at 835 n.2; *see also Rollins*, 2025 WL 793890, at *6. Thus, in the absence of binding authority stating otherwise, we remain in agreement with *Sneed* and the majority of our sister courts that have addressed the issue. *See Sneed*, 2017 WL 2588164, at *3; *Rollins*, 2025 WL 793890, at *7; *Chase*, 666 S.W.3d at 835 n.2; *Darkins*, 430 S.W.3d at 571–72; *Striblin*, 2019 WL 1049233, at *4; *Kelley*, 2016 WL 1446147, at *7; *Wilson*, 2014 WL 8332264, at *6; *see also Castro*, 2019 WL 3484426, at *3 ("We recognize that [Section] 9.32's 'statutorily imposed restrictions' on the use of deadly force were not at issue in *Bowen*; whether they constitute a 'legislative purpose' under [Section] 9.22(3) is a question the court of criminal appeals will have to resolve."). Accordingly, we conclude that the trial court did not abuse its discretion when it refused to submit Appellant's requested necessity instruction because Appellant received a deadly-force self-defense instruction.

Moreover, even if Appellant was entitled to a necessity instruction, he cannot show that he was harmed by its exclusion. Appellant asserts that necessity "is a more permissive justification, requiring only a showing of imminent harm," and that "had the jury received a necessity instruction, it could have acquitted [Appellant] based on necessity without ever reaching the narrower self-defense justification." The State responds that a necessity instruction in addition to the included self-defense instruction would have acted as a "belt and suspenders" because the conduct Appellant sought to justify was the same for both defenses.

---

[6]In *Bowen v. State*, the Court of Criminal Appeals held that a defendant charged with resisting arrest who *did not* use deadly force was entitled to both a self-defense instruction and a necessity instruction. *Bowen v. State*, 162 S.W.3d 226 (Tex. Crim. App. 2005); *Chase*, 666 S.W.3d at 835 n.2.

29

When the jury rejected Appellant's self-defense claim, it found that the State proved beyond a reasonable doubt that (1) Appellant did not reasonably believe that he was in fear of serious bodily injury or death, or (2) Appellant did not reasonably believe that the degree of his force was immediately necessary to protect himself against Howard's use of unlawful deadly force. *See* PENAL § 9.32(a); *Chase*, 666 S.W.3d at 836; *Rodriguez v. State*, 524 S.W.3d 389, 395 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). But as explained in *Rodriguez*, the jury's rejection of Appellant's self-defense theory shows that the jury would have also rejected a necessity theory:

> If the jury rejected the self-defense theory based on the first prong—no reasonable belief that appellant was in danger—then the jury also would have rejected the necessity defense because appellant did not reasonably believe that a specific harm was imminent. If the jury rejected the self-defense theory based on the second prong—no reasonable belief that force was immediately necessary to protect himself from [the victim]—then the jury also would have rejected the necessity defense because appellant did not reasonably believe that shooting [the victim] was immediately necessary.

*Rodriguez*, 524 S.W.3d at 395; *see Chase*, 666 S.W.3d at 836; *see also* PENAL §§ 9.22, 9.32. Therefore, because the conduct supporting each instruction is the same—Appellant shooting Howard—a necessity instruction would have overlapped with a self-defense instruction to such a degree that the inclusion of the self-defense instruction precluded any harm caused by the lack of a necessity instruction. *See Chase*, 666 S.W.3d at 835. Accordingly, the State is correct in its contention that a necessity instruction would have been a "belt and suspenders" in this case, and Appellant was not harmed by the trial court's refusal to include a necessity instruction in its charge. *See Rodriguez*, 524 S.W.3d at 395. We overrule Appellant's second issue.

*Requests for Instruction on the Lesser-Included Offense of Manslaughter*

In Appellant's third issue, he contends that the trial court abused its discretion by denying his requested jury instructions on the lesser-included offense of manslaughter. An offense is a lesser-included offense if: (1) it is established by proof of the same or less than all the facts required to establish the commission of the charged offense; (2) it differs from the charged offense only in that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission; (3) it differs from the charged offense only in that a less culpable mental state suffices to establish its commission; or (4) it consists of an attempt to commit the charged offense or an otherwise included offense. CRIM. PROC. art. 37.09.

Appellate courts use a two-step analysis to determine if a defendant is entitled to a charge on a lesser offense. *Ritcherson v. State*, 568 S.W.3d 667, 670 (Tex. Crim. App. 2018). "First, we compare the statutory elements of the alleged lesser offense and the statutory elements and any descriptive averments in the indictment." *Id.* at 670–71 (citing *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016)). Under this first step of the analysis, an offense is a lesser-included offense if it is within the proof necessary to establish the offense charged. *Bullock*, 509 S.W.3d at 924. Second, there must be some evidence in the record establishing that, if the defendant is guilty, he is guilty only of the lesser offense. *Wade v. State*, 663 S.W.3d 175, 181 (Tex. Crim. App. 2022). "In other words, the evidence must establish that the lesser-included offense provides the jury with a 'valid, rational alternative to the charged offense.'" *Id.* (quoting *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)). "[I]f more than a scintilla of evidence, from any source, raises the issue that the defendant was guilty only of the lesser offense, then the defendant is entitled to an instruction on the lesser offense." *Id.*

As a matter of law, manslaughter is a lesser-included offense of murder under Section 19.02(b)(2). *Roy v. State*, 509 S.W.3d 315, 317 (Tex. Crim. App. 2017) (citing *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012)). As such, the only issue for our consideration is the second prong, whether there was any evidence presented at trial from which a rational jury could have found that Appellant is guilty only of the lesser-included offense of manslaughter. *See Ransier v. State*, 670 S.W.3d 646, 650 (Tex. Crim. App. 2023).

A person commits manslaughter by recklessly causing the death of a person, which means that the person is aware of but consciously disregards a substantial and unjustifiable risk that the result—a death—will occur. *Roy*, 509 S.W.3d at 317–18; *Cavazos*, 382 S.W.3d at 384; *see* PENAL §§ 19.04(a), 6.03(c). Thus, the difference between murder under Section 19.02(b)(2) and manslaughter is the culpable mental state: "intent versus recklessness." *Cavazos*, 382 S.W.3d at 384; *compare* PENAL § 19.02(b)(2) (stating that a person commits murder if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual) *with id.* § 19.04(a) (stating that a person commits manslaughter if he recklessly causes the death of an individual).

For Appellant to have been entitled to an instruction on the lesser-included offense of manslaughter, the evidence must have shown that manslaughter was a "valid, rational alternative" to murder. *See Cavazos*, 382 S.W.3d at 385 (quoting *Hall*, 225 S.W.3d at 536). Appellant contends that there is some evidence in the record that he only recklessly shot Howard because he did not intend to cause Howard serious bodily injury. Appellant notes that he never said that he intended to cause serious bodily injury to Howard, but instead told Detective Shoemaker that (1) "everything happened so quickly, within a matter of two or three seconds, that he fired his gun when Howard rushed at him, and that [he] did not know where he hit Howard;" (2) "he thought he shot three times but could have shot four 'in the

excitement of the moment'"; and (3) that "you don't go outside your house expecting something like this to take place." Appellant asserts that the jury could have rationally determined that his statements to Detective Shoemaker showed that he was aware of, but disregarded, a substantial risk that his conduct would result in Howard's death. However, none of these statements support Appellant's contention that he did not intend to cause Howard serious bodily injury when he shot him. Rather, they merely indicate that Appellant did not know at the time of the interview the exact number of times he shot Howard or where Howard was hit.

There was no evidence supporting an assertion that Appellant only acted recklessly at the moment he fired the shots at Howard. The act of "[p]ulling out a gun, pointing it at someone, [and] pulling the trigger" four times does not rationally support an inference that Appellant did not intend to cause Howard serious bodily injury. *See Cavazos*, 382 S.W.3d at 385; *see also Ayala v. State*, 267 S.W.3d 428, 432 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) ("[Defendant's] use of a firearm, a deadly weapon per se, is evidence from which the jury could have inferred a specific intent to kill, 'unless in the manner of its use it is reasonably apparent that death or serious injury could not occur.'" (quoting *Medina v. State*, 7 S.W.3d. 633, 637 (Tex. Crim. App. 1999))). Further, Appellant said in his interview that he told Howard, "Stand back or I'll kill you." Finally, Appellant told Detective Shoemaker that he did not stop shooting until Howard "went down."

Accordingly, the evidence in this case does not show that Appellant merely acted recklessly and does not rise to the level that would allow a rational jury to find that, if Appellant is guilty, he is guilty only of manslaughter. *See Cavazos*, 382 S.W.3d at 385. Because there was no evidence that raised the issue of the lesser-included offense of manslaughter, the trial court did not err when it refused to submit a manslaughter instruction to the jury. We overrule Appellant's third issue.

33

*Requests for Instruction on the Lesser-Included Offense of Deadly Conduct*

In his fourth issue, Appellant contends that the trial court erred when it denied his request to include an instruction on deadly conduct. Similar to his argument regarding his requested manslaughter instruction, Appellant asserts that there is some evidence in the record that he "knowingly discharged a firearm at or in the direction of Howard, but not that he intended to cause serious bodily injury or death." Appellant again notes that he never told Detective Shoemaker that he intended to cause Howard serious bodily injury and that he did not know at the time of his interview where his shots hit Howard.

We must first determine whether felony deadly conduct is a lesser-included offense of murder as charged in the indictment. *See Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App 2011) ("We must compare the statutory elements and any descriptive averments in the indictment for the greater offense with the statutory elements of the lesser offense" (citing *Ex Parte Amador*, 326 S.W.3d 202, 206 n.5 (Tex. Crim. App. 2010))). The indictment alleged that Appellant intentionally and knowingly shot Howard with the intent to cause him serious bodily injury, thereby causing his death. A person commits the felony offense of deadly conduct if he "knowingly discharges a firearm at or in the direction of: (1) one or more individuals[.]" *See* PENAL § 22.05(b)(1), (e). Thus, "[b]ecause all of the elements of deadly conduct would be required to be presented to prove murder as alleged in the State's indictment," felony deadly conduct was a lesser-included offense of murder in this case. *See Barrios v. State*, 389 S.W.3d 382, 399 (Tex. App.—Texarkana 2012, pet. ref'd) (citing *Daniels v. State*, 313 S.W.3d 429, 432 (Tex. App.—Waco 2010, pet. ref'd)); *see also Braughton v. State*, 522 S.W.3d 714, 738 (Tex. App.—Houston [1st Dist.] 2017), *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2018) (citing *Ortiz v. State*, 144 S.W.3d 225, 233–34 (Tex. App.—Houston [14th

Dist.] 2004, pet. ref'd)); *Miles v. State*, 259 S.W.3d 240, 247 (Tex. App.—Texarkana 2008, pet. ref'd).

However, Appellant must still show that there was evidence that, if he is guilty, he is only guilty of deadly conduct. *See Wade*, 663 S.W.3d at 181. While the language of the indictment required a showing that Appellant intended to cause Howard serious bodily injury, felony deadly conduct only requires that Appellant knowingly discharged his firearm in the direction of Howard. *Compare* PENAL § 19.02(b)(2) *with id.* § 22.05(b)(1), (e). We have already concluded that there was no evidence in the record rationally supporting an inference that Appellant did not intend to cause Howard serious bodily injury. Accordingly, the evidence in this case does not rise to the level that would allow a rational jury to find that, if Appellant is guilty, he is guilty only of felony deadly conduct. Because there was no evidence that raised the issue of the lesser-included offense of felony deadly conduct, the trial court did not err when it refused to submit a deadly conduct instruction to the jury. We overrule Appellant's fourth issue.

*Excluded Defense Witness Testimony*

In Appellant's fifth issue, he contends that the trial court abused its discretion when it excluded four witnesses' testimony about "Howard's prior specific acts of violence." We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010); *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)); *Walter v. State*, 581 S.W.3d 957, 977 (Tex. App.—Eastland 2019, pet. ref'd). This same standard applies when we review a trial court's decision to admit or exclude extraneous evidence. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).

We will not reverse a trial court's decision to admit or exclude evidence unless that decision lies outside the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *De La Paz*, 279 S.W.3d at 343–44; *Cameron*, 241 S.W.3d at 19; *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005); *Walter*, 581 S.W.3d at 977. Furthermore, we will uphold a trial court's evidentiary ruling if it is correct on any theory of law that reasonably finds support in the record and is applicable to the case. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App. 2016); *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006); *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.).

After Marshal Whitley's testimony about Howard's confrontation with the code enforcement officer, trial counsel for Appellant's son asked the trial court to allow additional evidence of Howard's "uncommunicated offenses." Appellant's son's trial counsel asserted that the additional evidence of Howard's prior conduct "where he is always the aggressor, always pursuing things," should be admitted in order to prove that Howard was the first aggressor in this case. The State asserted that uncommunicated character evidence cannot be used to prove who was the first aggressor in a conflict, and that it is only admissible if it explains ambiguous conduct. The State further asserted that Howard's acts of raising a bat and threatening to kill Appellant were not ambiguous actions that required further explanation. The trial court determined that it would need to hear the proposed testimony before deciding whether it "clarifie[d] that [Howard] was the aggressor in this instance."

First, Marshal Whitley testified that he investigated a harassment case involving Howard. Marshal Whitley testified that Howard repeatedly contacted the code enforcement office's secretary and "cuss[ed] her out." At one point, Howard told the secretary that he would shoot the code enforcement officer if he came back.

The trial court held that Marshal Whitley's testimony was not about "acts of violence or assaultive acts . . . that would otherwise be allowed to clarify the issue that is before the Court."

Next, Christina Enriquez testified that Howard accused her, her mother, and her three-year-old child of "cutt[ing] in line" at a store. Enriquez said that Howard called them "fat b-----s," and she responded by saying "ugly things to him as well." Enriquez testified that Howard continued "saying things," and she and her family ignored him. When Enriquez and her family were walking back to their car, Howard began chasing them with a cart while "cuss[ing] [them] out" and threatening to "kick [Enriquez's] a-s." Enriquez testified that Howard told her "something to the effect of, I could beat your a-s and I don't care if you're a woman." A security guard told Howard to leave Enriquez and her family alone, and Howard began "verbally attack[ing]" the guard. The police were called.

The trial court directed trial counsel for Appellant's son to call his next witness before it made its ruling on the admissibility of Enriquez's testimony. The next witness, Meagan Baker, testified that she was a former employee of the City of Abilene's Code Enforcement Division. Baker said that she received "more than five" threatening phone calls from Howard in 2014. Howard threatened to "shoot anyone who came onto his property" and verbally "harass[ed]" and "abuse[d]" Baker by screaming and cursing at her. Howard came to the code enforcement office at one point, and Baker recalled feeling uncomfortable. Baker testified that she was afraid of Howard confronting her. The trial court held that Baker's testimony was not admissible.

Finally, Officer Daniel Henning with the Abilene Police Department testified that Samantha McGarity's mother asked the police department to conduct a welfare check on McGarity in 2016. The mother told the police department that McGarity and Howard lived together and that she was worried McGarity was being abused.

She also said that Howard had taken McGarity's keys from her and would not let her leave the house. Officer Henning and another officer went to the home. Officer Henning testified that, "[f]rom the moment we knocked on the door, [Howard] was just belligerent. He was just screaming at us, yelling at us." Howard told the officers that they did not have a right to be on his property and told the officers to leave. The officers explained that they were there to conduct a welfare check on McGarity. Officer Henning testified that he eventually spoke to McGarity, who said that she and Howard had had a "verbal altercation and that he was preventing her from leaving at first, but that she was fine."

Howard asked to speak with the officers' supervisor, and he "continued to be belligerent while waiting." Howard was also "belligerent" once the officers' supervisor arrived. Officer Henning testified that Howard told him he would "fight him in a cage" and "tap [him] out." As the officers were leaving, Howard told Officer Henning that he could not leave because he was being placed under citizen's arrest. The trial court held that Officer Henning's testimony was not admissible because it did not "clarify first aggressor" and was not "an act of violence or assaultive behavior."

Ultimately, the trial court held that none of the four witnesses' testimony about Howard's prior specific acts were admissible. However, each of the witnesses were allowed to testify generally about Howard's "bad character for violence." The defense also called an additional witness, a pawn broker that had an "encounter" with Howard, to testify that she believed Howard had a "[b]ad character for violent and threatening behavior."

On appeal, Appellant asserts that the trial court abused its discretion in excluding the four witnesses' testimony because it had relevance apart from character conformity; Appellant asserts that the testimony "clarified the issue of who was the first aggressor between Howard and [Appellant] and explained Howard's

38

conduct directed at [Appellant]." Generally, a party may not introduce evidence of specific past conduct of a person to prove conformity of character. TEX. R. EVID. 404(b); *Robbins v. State*, 88 S.W.3d 256, 259 (Tex. Crim. App. 2002) (citing *Montgomery*, 810 S.W.2d at 386–88); *Mozon v. State*, 991 S.W.2d 841, 846 (Tex. Crim. App. 1999). Nevertheless, extraneous evidence may be admissible for other purposes if it has relevance apart from character conformity. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011); *Hernandez v. State*, 426 S.W.3d 820, 825 (Tex. App.—Eastland 2014, pet. ref'd).

As applicable here, a defendant may offer reputation or opinion testimony and/or evidence of prior specific acts of violence that the defendant was aware of to show the reasonableness of the defendant's claim of apprehension of danger from the victim. *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009) (citing *Torres v. State*, 71 S.W.3d 758, 760 & n.4 (Tex. Crim. App. 2002)). "This is called 'communicated character' because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not." *Id.* (citing *Mozon*, 991 S.W.2d at 846).

Further, a defendant who raises the issue of self-defense may also introduce evidence of a deceased victim's character trait for violence to show that the victim was the first aggressor. *Id.* at 619; *see* TEX. R. EVID. 404(a)(3)(A). The "chain of logic" is that, if a witness testifies that the victim made an aggressive move against the defendant, another witness may testify about the victim's character for violence—but only through reputation and opinion testimony under Rule 405(a). *Miller*, 330 S.W.3d at 619; *see* TEX. R. EVID. 405(a). This type of evidence is called "uncommunicated character" evidence because the defendant need not be aware of the victim's violent character in order for the evidence to be admissible. *Miller*, 330 S.W.3d at 619. A defendant cannot offer evidence of prior specific acts of violence that he was unaware of to prove that the victim was the first aggressor because "[t]hat

use is an attempt to prove [a victim's] conduct in conformity with his violent character, and it is prohibited by Rules 404(a) and 405(a)." *Id.* at 619–20.

Finally, a victim's prior specific acts of violence can still be admissible when offered for a noncharacter purpose, "such as [a victim's] specific intent, motive for an attack on the defendant, or hostility." *Id.* at 620; *see* TEX. R. EVID. 404(b). Thus, "a victim's prior acts of violence also may be admissible to clarify the issue of first aggressor if the proffered act explains the victim's ambiguously aggressive conduct." *Allen v. State*, 473 S.W.3d 426, 446 (Tex. App.—Houston [14th Dist.] 2015, pet. dism'd); *see Torres v. State*, 117 S.W.3d 891, 894–95 (Tex. Crim. App. 2003); *Torres*, 71 S.W.3d at 762 ("As long as the proffered violent acts explain the outward aggressive conduct of the deceased at the time of the killing, and in a manner other than demonstrating character conformity only, prior specific acts of violence may be admitted even though those acts were not directed against the defendant.").

To support a claim that the deceased victim was the first aggressor, the defendant must first offer evidence of an actual act of aggression by the victim at the time of the offense. *Dudzik v. State*, 276 S.W.3d 554, 560 (Tex. App.—Waco 2008, pet. ref'd). As such, with respect to the "first aggressor" issue, specific instances of the victim's prior violent conduct is only admissible if (1) there is some ambiguous or uncertain evidence of a violent or aggressive act by the victim that tends to show the victim was the first aggressor, and (2) the proffered evidence tends to dispel the ambiguity or explain the victim's conduct at the time of the incident. *James v. State*, 335 S.W.3d 719, 728 (Tex. App.—Fort Worth 2011, no pet.) (citing *Mai v. State*, 189 S.W.3d 316, 321 (Tex. App.—Fort Worth 2006, pet. ref'd); *Reyna v. State*, 99 S.W.3d 344, 347 (Tex. App.—Fort Worth 2003, pet. ref'd)); *see also Torres*, 71 S.W.3d at 762 ("For purposes of proving that the deceased was the first aggressor, the key is that the proffered evidence explains the deceased's conduct.").

Appellant asserts that the excluded testimony would have been "evidence of Howard's prior unprovoked threatening and aggressive behavior towards others [that] would help clarify that Howard was the first aggressor towards [Appellant] based only on Howard's own irrational, aggressive state of mind." In response, the State asserts that the trial court did not abuse its discretion in excluding the testimony about Howard's prior specific acts because the testimony would not have explained any ambiguity in Howard's conduct. The State contends that "Appellant is not attempting to use the specifics of similar prior acts to explain some ambiguous conduct" of Howard. Instead, "Appellant simply seeks [to] show that [Howard] has acted aggressively in the past to prove he was aggressive here. That is pure character conformity, and it was rightly excluded."

We are unpersuaded by Appellant's argument that Howard's conduct toward Appellant, namely "start[ing] the confrontation with [Appellant], yelling and threatening him, throwing bricks at him, and ultimately grabbing a bat and raising it above his head to swing it at [him]" was ambiguous. While Appellant may be asserting that Howard's conduct was not a proper response to the situation, the rationality or appropriateness of conduct and the ambiguity of conduct are two different concepts. It is clear that each of Howard's named actions stemmed from the initial conversation between Appellant and Howard regarding the placement of a mattress. Accordingly, the excluded testimony about Howard's prior specific acts of violence would not have clarified Howard's actions. Rather, they would have supported Appellant's contention that Howard responds with violence "all the time," and Appellant's son's contention that Howard "goes crazy over anything and everything, whether it is his fault or not," "[t]o the point of making threats against everybody." "That use is an attempt to prove [Howard's] conduct in conformity with his violent character, and it is prohibited by Rules 404(a) and 405(a)." *Miller*, 330 S.W.3d at 620; *see* TEX. R. EVID. 404(a), 405(a). Accordingly, the trial court

did not abuse its discretion when it excluded the four witnesses' testimony about prior specific instances of Howard's violent conduct. TEX. R. EVID. 405(a); *see Miller*, 330 S.W.3d at 619; *see also Campos v. State*, No. 11-14-00089-CR, 2016 WL 365375, *4 (Tex. App.—Eastland 2016, pet. ref'd) (mem. op., not designated for publication) ("But where the acts of the victim in the incident in question are unambiguous and need no explanation, then instances of prior violent conduct are not admissible." (citing *London v. State*, 325 S.W.3d 197, 206 (Tex. App.—Dallas 2008, pet. ref'd))). Furthermore, because the trial court allowed the same witnesses to testify about Howard's character for violence through reputation and opinion testimony, we have fair assurance that any error in precluding the specific instances of conduct was harmless.

We overrule Appellant's fifth issue.

### This Court's Ruling

We affirm the judgment of the trial court.

JOHN M. BAILEY
CHIEF JUSTICE

April 17, 2025

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.